**JUDGE KOELTL**   08 CV 6849

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SUNRISE EQUITY PARTNERS, L.P.,                :
                      Plaintiff,            :
         - against -              :
SENDTEC, INC., PAUL SOLTOFF, and              :
  DONALD GOULD,                               :
                      Defendants.           :   **JURY TRIAL DEMANDED**
----------------------------------------------------------X


RECEIVED
COMPLAINT
JUL 31 2008
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff Sunrise Equity Partners, L.P. ("Sunrise") for its complaint against Defendants SendTec, Inc. ("SendTec" or the "Company"), Paul Soltoff, and Donald Gould alleges as follows:

## NATURE OF ACTION

      1. Sunrise purchased 500,000 shares of SendTec common stock from the Company for $750,000 on February 3, 2006. To induce Plaintiff to make this investment, Defendants made materially false statements concerning the Company's actual year end 2005 and January 2006 financial results and its projected quarterly and year end 2006 financial results. These misrepresentations include, among others, a combined revenue of $77 million for year end 2005 versus $49 million actual, a net loss of $83,600 for January 2006 versus $666,909 actual, revenue of $28,487,000 for the first quarter 2006 versus $8,513,022 actual, and revenue of $134,708,000 for year end 2006 versus $35,863,027 actual.

2. Defendants knew or were reckless is not knowing that their statements concerning actual 2005 and January 2006 financial results were false. Defendants also had no reasonable basis for their projections for quarterly and year end 2006 financial results.

3. Plaintiff sold its SendTec common stock for a loss of $590,054.92. SendTec's common stock sold publicly for $2.89 a share on February 3, 2006; its price at the close of trading on July 30, 2008 was $0.03.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, and under New York State law, for which the Court's supplemental jurisdiction under 28 U.S.C. § 1367 is invoked.

5. This Court has jurisdiction over the subject matter of this action pursuant to both diversity and section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 & 1332. The parties are residents of different states and the amount in controversy exceeds $75,000.

6. Venue is proper in this Judicial District pursuant to section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the closing at which Plaintiff acquired SendTec securities, took place in this Judicial District. The Stock Purchase Agreement pursuant to which Plaintiff purchased the SendTec securities at issue here contains a jurisdiction and venue clause that specifies that the parties have agreed to submit to the jurisdiction of any Federal or state court located in

New York for resolving any action or claim arising thereunder. The Stock Purchase Agreement also contains a New York choice of law provision.

7. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

## PARTIES

8. Plaintiff Sunrise Equity Partners, L.P. ("Sunrise") is a Delaware limited partnership with its principal place of business at 641 Lexington Avenue, New York, New York 10022. Sunrise purchased 500,000 shares of SendTec common stock for $750,000 on February 3, 2006. Marilyn S. Adler, Nathan A. Low, and Amnon Mandelbaum are members and the managers of Level Counter, LLC, the general partner of Sunrise which makes all investment decisions for Sunrise.

9. Defendant SendTec is a Delaware corporation with its principal place of business at 877 Executive Center Drive West, Suite 300, St. Petersburg, Florida 33702. SendTec is a marketing company primarily engaged in direct response marketing, selling products to the consumer using the Internet, television, print, radio, and other forms of advertising media. SendTec's stock is publicly traded on the over-the-counter bulletin board.

10. Defendant Paul Soltoff was, at all times relevant hereto, the Chief Executive Officer of SendTec.

11. Defendant Donald Gould was, at all times relevant hereto, the Chief Financial Officer of SendTec.

## FACTS

12. SendTec's corporate history includes various corporate permutations:

| Date | Corporate Event |
| --- | --- |
| April 27, 2004 | Chubasco Resources Corp. is formed in Nevada as an exploration stage company engaged in the business of mineral exploration |
| March 2005 | RelationServe, Inc. is formed in Delaware |
| May 16, 2005 | RelationServe, Inc. acquires a marketing business via reverse merger; before that it had "no operating business or assets" |
| June 13, 2005 | Chubasco Resources Corp. acquires RelationServe, Inc. via reverse merger and subsequently changes its name to RelationServe, Inc. |
| August 9, 2005 | RelationServe, Inc. forms SendTec Acquisition Corp. to acquire the business and assets of SendTec, a wholly-owned subsidiary of theglobe.com, Inc., via an Asset Purchase Agreement |
| August 29, 2005 | RelationServe, Inc. completes a reincorporation merger in Delaware under the name RelationServe Media, Inc. ("RelationServe") |
| October 31, 2005 | SendTec Acquisition Corp completes acquisition of SendTec after a restructuring of the deal and imposing conditions, including RelationServe meeting a number of conditions and financial milestones |
| February 3, 2006 | RelationServe consolidates with SendTec Acquisition Corp., after purporting to meet all conditions* and financial milestones/ (Sunrise makes its $750,000 investment in the Company) |
| March 17, 2006 | RelationServe changes its name to SendTec, Inc., subject to shareholder approval |
| June 15, 2006 | RelationServe's net assets are sold and its remaining operations discontinued |
| July 11, 2006 | RelationServe changes its name to SendTec, Inc. |

*The SendTec acquisition required that RelationServe repurchase 500,000 shares owned by Scott Hirsch, a former RelationServe executive with a criminal background. An investment of $750,000 was needed in order to satisfy this condition; the $750,000 was provided by Sunrise.

13. On August 15, 2005, RelationServe filed its Form 10QSB for the quarter ended June 30, 2005 with the SEC. For the quarter, RelationServe reported revenue of $3,986,353, operating income of $1,141,605, and accounts receivable of $2,907,801. For the six months then ended, RelationServe reported revenue of $6,678,023 and operating income of $1,701,331. The Form 10-QSB represented that the "financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information," that revenue was recognized "when persuasive evidence of an arrangement exists, services have been rendered or product delivery occurred, the sales price to the customer is fixed or determinable, and collectibility is reasonable assured" in accordance with SEC guidelines, and that accounts receivable were "reported at net realizable value."

14. On August 17, 2005, RelationServe filed a Form 8-K with the SEC which repeated the reported financial results reported for the quarter ended June 30, 2005.

15. On November 18, 2005, RelationServe filed its Form 10-QSB for the quarter ended September 30, 2005 with the SEC. For the quarter, RelationServe reported revenue of $3,704,575, operating income of ($1,078,112) and accounts receivable of $3,039,055. For the nine months then ended, RelationServe reported revenue of $10,382,598 and operating income of $662,614. The Form 10-QSB represented that the "financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information," that revenue was recognized "when persuasive evidence of an arrangement exists, services have been rendered or product delivery occurred, the sales price to the customer is fixed or determinable, and collectibility is reasonable assured" in

accordance with SEC guidelines, and that accounts receivable were "reported at net realizable value."

16. On November 18, 2005, RelationServe also filed a Form 8-K with the SEC which repeated the reported financial results reported for the quarter ended September 30, 2005.

17. On January 27, 2006, Defendant Gould solicited Sunrise to make an investment in the Company. Defendant Gould made a PowerPoint presentation entitled "Project Swordfish" to Ms. Adler. Defendant Gould went through the Project Swordfish presentation page-by-page with Ms. Adler and confirmed the figures set forth therein.

18. The Project Swordfish presentation made the following representations regarding year end 2005 financial results:

| **Entity** | **Revenue** | **EBITDA** |
|---|---|---|
| SendTec | $59,404,000 | $6,412,000 |
| RelationServe | $17,946,000/ $18 million | $4,959,000/ $5 million |
| RelationServe/SendTec (combined) | $77,359,000/ $77 million | $11,371,000/ $11 million |

19. Defendant Gould also presented Ms. Adler with historical and projected financial results for SendTec (then SendTec Acquisition Corporation) and reviewed those figures with her. For year end 2005, it was represented that "Gross Revenue Method" revenue would be $56,008,487, "Net Revenue Method" revenue would be $37,604,340, EBIDTA would be $4,834,190, net income would be $3,786,924, and that "FY 2005

6

financial results reflect actual results for Jan. thru Nov. and estimated Dec. 2005 financial results." For 2006, the Company projected the following revenue:

| Q1 (03/31/06) | Q2 (06/30/06) | Q3 (09/30/06) | Q4 (12/31/06) | YE (12/31/06) |
|---|---|---|---|---|
| $28,487,000 | $31,719,000 | $35,295,000 | $39,207,000 | $134,708,000 |

SendTec also projected to individually have revenue of $4,673,400 and incur a net loss of $83,600 for the month of January.

20. For 2006, SendTec and RelationServe projected the following revenue each individually:

| Entity | Q1 (03/31/06) | Q2 (06/30/06) | Q3 (09/30/06) | Q4 (12/31/06) | YE (12/31/06) |
|---|---|---|---|---|---|
| SendTec | 21,161,000/ 18,001,083 | 23,478,000/ 25,928,908 | 26,024,000/ 29,690,275 | 28,778,000/ 34,150,375 | 99,441,000/ 107,770,642 |
| RelationServe | 7,327,000 | 8,242,000 | 9,271,000 | 10,428,000 | 35,267,000 |

21. On February 3, 2006, Sunrise, in reliance on the above representations, entered into a Stock Purchase Agreement with SendTec for the purchase of 500,000 shares of common stock for $750,000.

22. Article III of the Stock Purchase Agreement entitled "REPRESENTATIONS AND WARRANTIES OF THE SELLER," in pertinent part, states:

> 3.5   SEC Documents. *All SEC Reports* (as such term is defined in the SendTec Purchase Agreement) *filed by the Seller as of or for any Period beginning on or after June 10, 2005, (i) were prepared in all material respects in accordance with the requirements of the Securities Exchange Act of 1934, as amended and (ii) did not at the time they were filed* (or, if amended or suspended by a filing prior to the date hereof, then on the date of such filing) *contain any untrue statement of a material fact* or omit to state a material fact

required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

3.6    Additional Representations.  The Seller also makes the additional representations and warranties as are provided in Sections 3.1 and 3.2 of the SendTec Purchase Agreement . . .

(Emphasis added.)

Section 3.2, "Representations and Warranties of the Company at the Consolidation Date," of the SendTec Purchase Agreement, in turn and in pertinent part, provides:

(b)    SEC Reports; Financial Statements.  The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Company was required by law to file such material) (the foregoing material, including the exhibits thereto and documents incorporated by reference therein filed in or after June 10, 2005 being collectively referred to herein as the "SEC Reports").  As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and *none of the SEC Reports, when filed, contained any untrue statement of a material fact* or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  *The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing.  Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"),* except as may be otherwise specified in such financial statements or notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(c)     Material Changes. Since the date of the latest audited financial statements included within the SEC Reports, (i) *there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect*; . . .

(*emphasis* added.)

23.     Section § 3.1(b) of the Purchase Agreement defines "Material Adverse Effect," among other things, as anything that would have "a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole."

SUBSEQUENTLY REPORTED FINANCIAL RESULTS

24.     For year end 2005, the Company reported the following financial results:

| Entity | Revenue | EBIDTA |
| --- | --- | --- |
| RelationServe | $11,302,780 | ($1,452,756) |
| SendTec | $37,769,742 | $3,936,195 |
| RelationServe/SendTec (combined) | $49,072,522 | $2,141,773 |

25.     For 2006, the Company reported the following revenue:

| Q1 (03/31/06) | Q2 (06/30/06) | Q3 (09/30/06) | Q4 (12/31/06) | YE (12/31/06) |
| --- | --- | --- | --- | --- |
| $8,513,022* | $10,562,738 | $9,404,920 | $7,382,347 | $35,863,027 |

* The Company also reported revenues of $11,400,000 "if the acquisitions had been consummated as of January 1, 2006."

26.     For the first quarter 2006, the Company also reported that it took "a $153,389 charge for its proportionate share of [SendTec's] losses for the month ended January 31, 2006." The Company's proportionate share of the loss was 23% which means that SendTec had actually suffered a loss of $666,909 in January 2006.

9

REPRESENTED VS. ACTUAL FINANCIAL RESULTS

27. For year end 2005, represented to actual financial results compare as follows:

| Entity-Account | Represented | Actual | Difference |
|---|---|---|---|
| RelationServe/SendTec–Revenue | $77,359,000/ $77 million | $49,072,522 | ($28,286,478) (36%) |
| RelationServe/SendTec–EBITDA | $11,371,000/ $11 million | $2,141,773 | ($9,229,227) (81%) |
| RelationServe–Revenue | $17,946,000/ $18 million | $11,302,780 | ($6,643,220) (37%) |
| RelationServe–EBITDA | $4,959,000/ $5 million | ($1,452,756) | ($6,411,756) (129%) |
| SendTec–Revenue | $59,404,000/ $56,008,487 (gross revenue) $37,604,340 (net revenue) | $37,769,742 (gross/net revenue hybrid) | (21,634,258) (36%) |
| SendTec–EBITDA | $6,412,000 | $3,936,195 | ($2,475,805) (39%) |
| SendTec–Net Income | $3,786,924 | $986,360 | ($4,773,284) (126%) |

28. When the 2005 financial results were presented to Sunrise, RelationServe/SendTec knew or were reckless in not knowing that the presented financial results were false. This constitutes a Material Adverse Effect and therefore a breach of Section 3.6 of the Stock Purchase Agreement (incorporating Section 3.2(c) of the SendTec Purchase Agreement).

29. For 2006, represented to actual revenue results for the Company compare as follows:

| Period | Represented | Actual | Difference |
|---|---|---|---|
| Q1 (03/31/06) | $28,487,000 | $8,513,022/ $11,400,000 | (19,973,978)/(70%) ($17,074,000)/(60%) |
| Q2 (06/30/06) | $31,719,000 | $10,562,738 | ($21,156,262)/(67%) |
| Q3 (09/30/06) | $35,295,000 | $9,404,920 | ($25,890,080)/(73%) |
| Q4 (12/31/06) | $39,207,000 | $7,382,347 | ($31,824,653)/(81%) |
| YE (12/31/06) | $134,708,000 | $35,863,027 | ($98,844,973)/(73%) |

30. The Company knew or was reckless in not knowing that SendTec's (individual) projected revenue of $4,673,400 for January 2006 was not going to be as represented when the Company reported (combined) revenue of only $8,513,022 for the entire first quarter. This constitutes a Material Adverse Effect and therefore a breach of Section 3.6 of the Stock Purchase Agreement (incorporating Section 3.2(c) of the SendTec Purchase Agreement).

31. The Company also knew or was reckless in not knowing that SendTec's (individual) net loss for January 2006 was not going to be $83,600 as represented when it incurs a net loss of $666,609 for that month. This also constitutes a Material Adverse Effect and therefore a breach of Section 3.6 of the Stock Purchase Agreement (incorporating Section 3.2(c) of the SendTec Purchase Agreement).

32. Defendants representations to Plaintiff concerning SendTec's performance for year end 2005 and January 2006 were made either recklessly or with knowledge that they

were not true. That year had ended nearly a month before Plaintiff's purchase of SendTec common stock on February 3, 2006.

33. On May 31, 2006, Defendant Soltoff told Ms. Adler during a teleconference that RelationServe's revenues were neither sustainable nor collectible and that it was only generating losses. Defendant Soltoff also disclosed that the combined companies had not realized any synergies, which was contrary to the representation in the Project Swordfish presentation that the combined companies would realize "Significant Operating Synergies."

34. Comparing SendTec and Relationserve's individual revenue projections to actual results for the Company (combined) also reveals that the failure to meet projections can not be blamed on a failure to achieve merger synergies:

| Entity | Q1 (03/31/06) | Q2 (06/30/06) | Q3 (09/30/06) | Q4 (12/31/06) | FY (12/31/06) |
|---|---|---|---|---|---|
| SendTec | 21,161,000/ 18,001,083 | 23,478,000/ 25,928,908 | 26,024,000/ 29,690,275 | 28,778,000/ 34,150,375 | 99,441,000/ 107,770,642 |
| RelationServe | 7,327,000 | 8,242,000 | 9,271,000 | 10,428,000 | 35,267,000 |
| Actual-Both | 8,513,022 | 10,562,738 | 9,404,920 | 7,382,347 | 35,863,027 |

Actual revenue results for the Company combined are grossly less than the projected revenue for SendTec individually.

35. On June 13, 2006, during a conference call with investors, Defendants Soltoff and Gould said that RelationServe had turned out to be a "house of cards." Investors were told that RelationServe's sales were basically all returns and customers refused to pay because the databases were either not delivered or the delivered database were too dated to be of any value to the customer. Investors were also told that the audit of RelationServe

12

performed as part of the due diligence had been "flawed" and that the acquisition would not have taken place if the audit had been done properly because RelationServe would not have met its financial milestones for consummation of the deal.

36. Under GAAP, revenue is recognized when 1) the revenue is realized (cash received) or realizable (promise to pay) and 2) the revenue is earned (the entity has accomplished its obligations to be entitled to the revenue). Financial Account Standards Board (FASB) Statement of Financial Accounting Concepts No. 5. The SEC–issued staff accounting bulletin (SAB) 101 says that these two revenue criteria are met "when all of the following criteria are met: [p]ersuasive evidence of an arrangement exists, [d]elivery has occurred or services have been rendered, [t]he seller's price to the buyer is fixed or determinable, and [c]ollectibility is reasonably assured." Release No. SAB 101 (footnotes omitted) *available at* http://www.sec.gov/interps/account/sab101.htm As noted above, *supra* at 6, this is precisely the standard RelationServe purported to follow. Accounts receivable are booked when the revenue recognition criteria are met.

37. On June 15, 2006, SendTec sold substantially all of the net assets of RelationServe for $1.4 million, remaining liable for certain contingencies and liabilities, including any liabilities in excess of $3 million. SendTec also discontinued the remaining operations of RelationServe. SendTec recognized a loss of $146,000 on the sale of the net assets and took a charge of $459,000 on the discontinued operations. RelationServe, which was represented to generate revenues of $18 million in 2005 and $35 million in 2006, lasted for less than 4½ months after Sunrise's investment.

38. RelationServe's reported revenues, operating income, accounts receivable and other results contained in the "SEC Reports" were materially overstated.

39. On June 28, 2006, Michael Brauser, Chairman of the Company, during a teleconference told Ms. Adler that RelationServe had become a distraction and that its receivables were from dissatisfied clients. Brauser also told Adler that Sunrise would be included in any workout of SendTec's default with the debenture holders.

40. On August 23, 2006, the Company announced that it had reached an agreement with its debenture holders that worked-out its default. Despite SendTec's representations, Sunrise was not included in the workout.

### FIRST CLAIM FOR RELIEF
(BREACH OF CONTRACT)

41. Plaintiff incorporates by reference paragraphs 1 through 40.

42. Sunrise purchased its shares from SendTec pursuant to the Stock Purchase Agreement.

43. The Stock Purchase Agreement contained representations and warranties concerning financial performance and SEC filings.

44. The year end 2005 financial results and January 2006 results presented to Sunrise were false. This constitutes a Material Adverse Effect and therefore a breach of Section 3.6 of the Stock Purchase Agreement (incorporating Section 3.2(c) of the SendTec Purchase Agreement) and a breach of contract.

45. RelationServe's reported revenues, operating income, accounts receivable and other results contained in the "SEC Reports" were materially overstated. This constitutes a

14

breach of Sections 3.5 and 3.6 of the Stock Purchase Agreement (incorporating Section 3.2(b) of the SendTec Purchase Agreement) and a breach of contract.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**Violation Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**

</div>

46. Plaintiff incorporates by reference paragraphs 1 through 45.

47. Defendants carried out a plan, scheme, and course of conduct that was intended to and did deceive Plaintiff and cause them to purchase Sendtec common stock. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

48. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements that were made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiff as a purchaser of SendTec securities in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

49. Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made about SendTec and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon Plaintiff. Sendtec needed to have Plaintiff's money in order to complete the RelationServ/SendTec merger.

50. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and with the effect of inducing Plaintiff to purchase Sendtec securities.

51. As demonstrated by Defendants' misstatements of the Company's business, operations, and revenues, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52. At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known the truth regarding SendTec's financial performance, Plaintiff would not have acquired SendTec common stock.

53. Plaintiff was induced to acquire SendTec common stock by the misrepresentations made by Defendants.

54. By virtue of the foregoing, Defendants have violated section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

55. As a direct and proximate result of Defendants' wrongful conduct violative of section 10(b) of the Exchange Act, Plaintiff suffered damages in connection with its purchase of SendTec common stock in an amount to be established at the trial of this action.

## THIRD CLAIM FOR RELIEF
### New York Common Law

56. Plaintiff incorporates by reference paragraphs 1 through 55.

57. Defendants made false and misleading statements to Plaintiff for the purpose of inducing Plaintiff to purchase SendTec common stock.

58. Plaintiff purchased SendTec common stock in reasonable reliance on the truthfulness of the statements made by Defendants.

59. Plaintiff suffered damages as a result of Defendants' fraudulent and negligent misrepresentations in an amount to be established at the trial of this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(i) Awarding compensatory damages in favor of Plaintiff against Defendants, jointly and severally, for the damages sustained by Plaintiff as a result of Defendants' wrongdoing in an amount to be established at the trial of this action, plus interest thereon;

(ii) Awarding Plaintiff their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(iii) Awarding Plaintiff punitive damages; and

(iv) Granting Plaintiff such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demand a trial by jury.

Dated: New York, New York
July 31, 2008

RABIN & PECKEL LLP

By: ______________________________

I. Stephen Rabin – IR 5058
Joseph V. McBride – JM 3550
275 Madison Avenue, Suite 420
New York, NY 10016
Telephone: (212) 880-3722
Facsimile: (212) 880-3716

Attorneys for Plaintiff